# STATE OF CONNECTICUT *v.* CHARLIE D. SANTIAGO
## (AC 27110)

Harper, Rogers and Lavine, Js.

Argued October 12, 2006—officially released April 3, 2007

*Lauren Weisfeld*, senior assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Susan Filan*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Charlie D. Santiago, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a).[1] The defendant claims that (1) prosecutorial misconduct deprived him of a fair trial, and (2) the trial court's self-defense instruction deprived him of his rights to present a defense and to a fair trial.[2] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 12, 1993, at approximately noon, the defendant was washing his automobile alongside a residential building in the P.T. Barnum apartment complex in Bridgeport. His aunt lived in the building, located just off Taylor Drive. The sixteen year old victim, John Barnes, and three other individuals approached the defendant and ordered him to hand over his possessions to them. Barnes got into the defendant's automobile, the keys to which were in the ignition, and drove away from the defendant. The defendant proceeded to the side of his aunt's building and called to his aunt. His

---

[1] The court sentenced the defendant to a twenty-five year term of incarceration.

[2] The defendant also claims that the court's reasonable doubt instruction was deficient, thereby depriving him of his right to due process. The defendant explicitly acknowledged, both in his brief and during argument before this court, that our Supreme Court has upheld reasonable doubt instructions substantially similar to that delivered by the trial court in the present case. We agree. It is axiomatic that "[w]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . Thus, it is not within our province to reevaluate or replace those decisions." (Internal quotation marks omitted.) *State* v. *Jackson*, 93 Conn. App. 671, 678–79, 890 A.2d 586, cert. granted on other grounds, 278 Conn. 902, 896 A.2d 105 (2006). Accordingly, we reject the defendant's claim without further discussion.

aunt came to a window of her apartment and conversed with the defendant. The defendant's aunt quickly exited the apartment building and delivered to the defendant a Ruger Mini-30 semiautomatic assault rifle.

In possession of the rifle, the defendant ran toward Taylor Drive and observed Barnes driving his automobile away from the scene. The defendant fired twenty-two bullets in Barnes' direction. Nineteen bullets struck the automobile, several also struck Barnes, and, as a result of multiple gunshot wounds inflicted by the defendant, Barnes bled to death in the automobile. The automobile came to rest after mounting a sidewalk and hitting a utility pole.

The defendant disposed of the rifle in his aunt's apartment building and obtained from his aunt the keys to another automobile. He drove away from the apartment complex, passing by Barnes in his vehicle. The defendant drove to his residence, where he took a shower, changed his clothing and contacted his attorney. Later that day, his attorney accompanied him to the Bridgeport police department, where he provided a statement to the police. The defendant did not deny shooting Barnes but explained the shooting as an act of self-defense. Essentially, the defendant claimed that he had been the victim of a carjacking at the hands of four unknown armed youths, including Barnes. According to the defendant, these perpetrators robbed him at gunpoint of his jewelry and emptied his pockets. Barnes got into his automobile and, before driving away, instructed the others to kill the defendant, stating, "Bust him. Pop him." The defendant claimed that he wrestled a rifle away from one of the perpetrators and came under fire from many directions. The defendant stated that he discharged the rifle for his "protection."

The defendant testified at trial. For the most part, he reiterated this version of events, asking the jury to

conclude that he had acted in self-defense. Adding some relevant details to his version of events, the defendant testified that after he took possession of the rifle and discerned that he was being fired on, he fired his rifle only once in the direction of one of the shooters. Barnes, driving the defendant's automobile, was in that direction. The defendant also testified that when he drove away from the apartment complex, he left his aunt near his automobile where Barnes lay dead and instructed her to notify the police. Additional facts will be set forth as necessary.

I

The defendant first claims that prosecutorial misconduct deprived him of a fair trial. We disagree.

During the evidentiary phase of the trial, the state introduced the defendant's statement to the police. The defendant stated therein that after the shooting, he went to his residence and contacted his attorney. The defendant also stated that his attorney later accompanied him to the police department. The defendant did not object to the admission of the statement. During direct examination, the defendant's attorney elicited testimony from the defendant that he contacted the attorney after the shooting and that the attorney was present with him at the police department. During the state's cross-examination, the defendant reiterated that after the shooting, he drove by his automobile, left his aunt near the automobile so that she could call the police, changed his clothing and contacted his attorney.

During closing argument, the defendant's attorney argued in relevant part: "We have a high school student [the defendant], based upon, apparently, his upbringing, who goes to the police department within an hour and a half after a shooting and says something happened. I'm really not entirely sure what it is, but I was involved in it and I shot a gun. You've heard the questions asked

of the eyewitnesses. Well, you didn't go to the police, did you? No, but here we have a person that did go to the police. He did the right thing. Or did he? If you had a project mentality, you'd say, let's see what happens before I open my mouth. Let me see how long it takes them to track the car back to me. I can turn around and say, somebody—I have no idea what happened to my car. Somebody stole it. I left the keys in the ignition. You think that street mentality doesn't exist, folks? No, because you get a young man who says we've got to go to the police. Something just happened. And what do they do? They charge him for it."

During the state's rebuttal closing argument, the prosecutor argued in relevant part: "[E]ven if you never resolve for yourselves where that gun [used in the shooting] came from, it doesn't matter because once [the defendant] gets the gun, he's only allowed to use deadly force in self-defense if it's justified. Ask yourself, how is it justified to shoot somebody in the back as they're driving your car away? When you get robbed, you get mad, you get scared, you call the police. You lose your stuff. You have insurance, you have insurance. If you don't, you don't. You lose your stuff. You don't shoot and kill your robber because you're mad that you got robbed. That's the line that the defendant crossed. That's where he comes—that's where it turns from him being the victim to him being the murderer.

"And the defendant tells you that he goes to the police. But who does he call first? He calls his lawyer. If you were involved in a scuffle in which you just came upon a semiautomatic rifle and you pulled the trigger once and all the bullets came out, and—do you think you might stand there, like, when you have a motor vehicle accident? You're not allowed to leave the scene; you have to just freeze and call the police and wait for them to come because they're going to make a determination as to the physical evidence, what happened? He

ditched the gun, he showered, called his lawyer. He went with his lawyer and, with his lawyer, he made a statement to the police. The state would submit to you that the statement is the evidence of spin in this case because what the defendant tells you is a physical impossibility. It just isn't possible, folks, that he pulled the trigger once [and] the whole thing came out."

The defendant claims that the prosecutor's argument constituted misconduct on two grounds. First, the defendant claims that the prosecutor "argued outside the evidence and used her special position to mislead the jury . . . ." The defendant claims that the prosecutor suggested that the defendant had violated the law by leaving the scene of the shooting. The defendant argues that this argument was unsupported by the law or the evidence. Second, the defendant claims that the prosecutor improperly "penalized" him for exercising his right to counsel, guaranteed by the federal and state constitutions,[3] by "intimat[ing] that an inference of guilt flowed from [his] consultation with counsel before police interrogation."

The issue is whether the prosecutor's argument caused or contributed to a due process violation. We analyze the defendant's claim by engaging in a two step process.[4] First, we must determine if misconduct occurred. If it did, we must then determine whether it deprived the defendant of a fair trial by applying the factors set forth in State v. Williams, 204 Conn. 523,

---

[3] To the extent that the defendant attempts to assert a state constitutional claim, we decline to review it because he has not analyzed such claim separately under the state constitution. See State v. Sinvil, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004).

[4] The defendant did not object to the challenged argument at trial, but his claim is nonetheless reviewable. See State v. Ritrovato, supra, 280 Conn. 63. The defendant also asks this court to deem the prosecutor's remarks to have constituted plain error. See Practice Book § 60-5. We do not conclude that any misconduct occurred. Accordingly, the defendant has not demonstrated that the plain error doctrine is applicable to his claim.

540, 529 A.2d 653 (1987). *State* v. *Ritrovato*, 280 Conn. 36, 62–63, 905 A.2d 1079 (2006). We now address each of the claimed incidents of misconduct separately.

A

We first address that aspect of the defendant's claim, that the prosecutor improperly suggested that the defendant violated the law by leaving the scene of the shooting. The defendant claims that the prosecutor argued outside of the evidence and used her special position to mislead the jury. As the defendant correctly observes, he was not charged with a crime because he left the scene of the shooting.

A prosecutor is a high public officer and, by virtue of his or her office, generally exercises great influence over the jury. *State* v. *Ritrovato*, supra, 280 Conn. 62. It cannot be disputed that when a prosecutor comments on facts not in evidence or legal principles that do not apply to the matters at hand, there is a danger that such comment unfairly may sway the jury. It is axiomatic that "a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 394, 832 A.2d 14 (2003). When the prosecutor's argument deviates from the evidence, there is a risk that the jury may assume that the prosecutor has independent knowledge of facts that were not before the jury. See *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002). "[A] prosecutor must not comment on evidence that is not part of the record, nor is he to comment unfairly on the evidence adduced at trial so as to mislead the jury." (Internal quotation marks omitted.) *State* v. *Johnson*, 82 Conn. App. 777, 793, 848 A.2d 526 (2004). Conversely, the prosecutor may invite the jury to draw reasonable inferences from the evidence or the facts supported by the evidence.

See *State* v. *Dearborn*, 82 Conn. App. 734, 748, 846 A.2d 894, cert. denied, 270 Conn. 904, 853 A.2d 523 (2004).

Viewing the challenged argument in the context of the closing argument of both parties, we do not conclude that it constituted misconduct. As set forth previously, the defendant argued that there were inferences to be drawn from the evidence that he left the scene of the shooting and later presented himself at the police department. The defendant invited the jury to infer that his conduct after the shooting was, if not commendable, that of a person who had not committed a crime. Specifically, the defendant's attorney took issue with the defendant's arrest following his voluntary statement. The prosecutor responded to this argument in her rebuttal argument. The prosecutor asked the jury to view the defendant's conduct after the shooting by using common sense. She stated: "If you were involved in a scuffle in which you just came upon a semiautomatic rifle and you pulled the trigger once and all the bullets came out . . . do you think you might stand there, like, when you have a motor vehicle accident? You're not allowed to leave the scene; you have to just freeze and call the police and wait for them to come because they're going to make a determination as to the physical evidence, what happened?"

We disagree that the argument referred to facts that were not in evidence or that it invited the jury to draw unreasonable inferences from the evidence. Plainly, the evidence at issue, concerning the defendant's conduct after the shooting, was before the jury. The argument reflected that the prosecutor invited the jury to infer that the defendant's conduct in leaving the scene was inconsistent with that of a person who had not committed a crime. The prosecutor argued by analogy, comparing a shooting scene to a motor vehicle accident scene. This commonly used mode of argument is reflected by her use of the word "like." It is unreasonable to conclude that the prosecutor intended to suggest, or that

it was possible that the jury would have understood the argument to suggest, that the defendant violated the law by leaving the scene of the shooting. Instead, the prosecutor suggested that there were inferences that could be drawn from the defendant's actions following the shooting that were adverse to those suggested by the defendant's attorney. "[W]e are mindful . . . that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 441, 902 A.2d 636 (2006).

B

We next address that aspect of the defendant's claim that the prosecutor deprived him of a fair trial by inviting the jury to infer guilt from the fact that he met with counsel prior to his interrogation by the police.[5] Although our research has not revealed a similar claim addressed by an appellate court of this state, the issue has been addressed by numerous federal courts. A defendant has the right to the assistance of counsel for his defense; that right is secured by the sixth and

---

[5] We treat this claim as one of prosecutorial misconduct that deprived the defendant of a fair trial because that is how the defendant has presented the claim generally. At various points in his analysis, however, the defendant appears to argue that the prosecutor infringed on or burdened his right to consult with counsel. Certainly, some of the principles that bear on our analysis apply to freestanding claims of infringement on the right to counsel, yet that freestanding constitutional claim has been neither argued nor briefed in the present case.

fourteenth amendments to the United States constitution. Generally, while a prosecutor may invite the jury to draw reasonable inferences from the facts in evidence, he or she may not invite the jury to draw adverse inferences from the fact that a defendant, at any time, retained counsel. "A prosecutor may not imply that an accused's decision to meet with counsel, even shortly after the incident giving rise to a criminal indictment, implies guilt." *Sizemore* v. *Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990); see also *United States* v. *Santiago*, 46 F.3d 885, 892 (9th Cir.) ("under the Sixth Amendment right to counsel, prosecutors may not imply that the fact that a defendant hired a lawyer is a sign of guilt"), cert. denied, 515 U.S. 1162, 115 S. Ct. 2617, 132 L. Ed. 2d 860 (1995); *United States* v. *McDonald*, 620 F.2d 559, 564 (5th Cir. 1980) ("[i]t is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel"), on appeal after remand, 672 F.2d 864 (11th Cir. 1982); *United States ex rel. Macon* v. *Yeager*, 476 F.2d 613, 615 (3d Cir.) ("[i]t can be argued . . . that a prosecutor's comment seeking to raise in the jurors' minds an inference of guilt from the defendant's constitutionally protected conduct constitutes a 'penalty' on the free exercise of a constitutional right"), cert. denied, 414 U.S. 855, 94 S. Ct. 154, 38 L. Ed. 2d 104 (1973). In *United States* v. *Liddy*, 509 F.2d 428, 444–45 (D.C. Cir. 1974), cert. denied, 420 U.S. 911, 95 S. Ct. 833, 42 L. Ed. 2d 842 (1975), the United States Court of Appeals for the District of Columbia Circuit relied on the principle that it is always improper to invite the jury to draw an adverse inference from the fact that a defendant retained counsel. The court further held that it is improper to invite the jury "to take into account the time and circumstances of retaining an attorney, and to draw whatever inferences as seem appropriate." Id., 444. The court further explained: "It would be a rare

case indeed where the prosecutor could point out that the incriminating feature of the employment of counsel—in the absence of explanation—rests not in the employment as such but in the time and circumstances surrounding that event, and inferences therefrom that reflect adversely on the defendant." Id.

It is clear that we must examine the purpose of the prosecutor's comments as well as what inferences the comments were likely to arouse in the mind of an average juror. See *United States* v. *McDonald*, supra, 620 F.2d 564. We do not conclude that the prosecutor undeniably or openly hinted to the jury that the fact that the defendant hired or consulted with counsel was probative of his guilt. Cf. *Bruno* v. *Rushen*, 721 F.2d 1193, 1194–95 (9th Cir. 1983), cert. denied sub nom. *McCarthy* v. *Bruno*, 469 U.S. 920, 105 S. Ct. 302, 83 L. Ed. 2d 236 (1984). The state argues that the prosecutor was not guided by such an improper purpose but that her argument was a direct response to the closing argument of the defendant's attorney. The state argues that the defendant's counsel inaccurately summarized the sequence of events that transpired after the shooting and invited the jury to infer that the defendant had reported the shooting quickly and that he had done "the right thing." The state argues that the prosecutor was entitled to refute the defendant's argument by referring to the evidence that the defendant had contacted an attorney before he reported the shooting to the police.

Defense counsel summarized the events after the shooting by referring specifically to the evidence that the defendant went to the police department within an hour and one half after the shooting; defense counsel invited the jury to infer from this conduct that the defendant acted more than reasonably by going to the police shortly after the shooting, that he did "the right thing." The prosecutor specifically referred to this line of argument and responded to it by setting forth a more

detailed description of the events that unfolded after the shooting. The prosecutor referred to the evidence that the defendant "ditched" his rifle, left the scene of the shooting, showered, called his attorney and, accompanied by his attorney, gave a statement to the police. The prosecutor openly questioned the propriety of the defendant's decision to leave the scene, suggesting that the defendant should have waited for the police to arrive.

Defense counsel are not "immunized from being spoken about during criminal trials." *United States* v. *Frazier*, 944 F.2d 820, 824 (11th Cir. 1991). If reference to a defendant's decision to consult with counsel is "focused and pertinent" to a proper issue, rather than part of an invitation to infer guilt, it is not improper. Id. We are persuaded that the prosecutor in the present case did not improperly appeal to the jury to infer guilt from the defendant's having contacted an attorney and having received the counsel of an attorney. The prosecutor's specific references to these facts in evidence were isolated and appear to have been directed at clarifying the sequence of events described by the defendant's counsel as well as the positive inferences that defense counsel invited the jury to draw therefrom. It would be fundamentally unfair to the state were we to permit the defendant's attorney to comment on the evidence of his conduct after the shooting and to suggest reasonable inferences to be drawn from that conduct, while precluding the state from doing the same in response. For these reasons, we do not conclude that the prosecutor's argument reflected an improper purpose or that it is reasonably possible that the jury would have drawn an improper inference from the argument. While we reaffirm the admonition that prosecutors tread on extremely thin ice when they comment on a defendant's decision to consult with counsel, we are satisfied that the challenged argument fell within

the bounds of proper comment on the evidence and was a response to the argument of defense counsel. For these reasons, we conclude that there is no misconduct.[6]

## II

The defendant next claims that because the court referred to Barnes as "the victim" in its self-defense instruction, the instruction was improper and deprived him of his rights to present a defense and to a fair trial.[7] We disagree.

The record reflects that numerous times during the course of the trial, the defendant's attorney, as well as the prosecutor, referred to Barnes as "the victim." The defendant submitted to the court an initial written request to charge, which included a self-defense instruction. In his requested instruction concerning the crime of manslaughter in the first degree, the defendant used the term "victim" eleven times, in reference to Barnes. The defendant subsequently submitted another written request to charge that set forth exclusively a self-defense instruction. To a significant degree, the court's instruction[8] mirrored the defendant's requested instruction. Importantly, the defendant's requested self-

---

[6] The defendant also argues that this court should exercise its supervisory authority to redress the prosecutor's "deliberate misconduct." Because we do not find that any misconduct occurred, we need not address this aspect of the defendant's claim.

[7] In addition to the claim addressed in part II, the defendant argues that the court "depriv[ed] [him] of his right to have his jury view his assessment of whether [an] attack was imminent from his perspective alone." This aspect of the claim is not briefed in an adequate manner, for the brief does not set forth in an unambiguous manner either the basis of the claim or the authority that purportedly supports it. Further, although the defendant neither withdrew nor conceded the invalidity of this claim at the time of argument before this court, he nonetheless acknowledged that it was likely unsupported by the law. We conclude that the court adequately conveyed to the jury the applicable legal principles relevant to the defense of self-defense.

[8] The court used the term "victim," in obvious reference to Barnes, at several points during its charge. In its self-defense instruction, the court stated: "So, I've talked to you about the elements of the crime of murder,

## defense instruction included the terminology of which

the intent and the proximate cause. The issue of self-defense has been raised in this case. Self-defense is a means by which the law justifies the use of force that would otherwise be illegal. Once self-defense is raised in the case, the state must disprove the defense beyond a reasonable doubt.

"A person is justified in the use of reasonable physical force upon another when he reasonably uses such force as necessary to protect himself from the use of or imminent use of force by another. Self-defense is a legal defense to the use of force that would otherwise be criminal.

"I'll now define that term to you in a legal sense. You are to follow this instruction in reviewing the evidence in this case and not to apply any common or colloquial meaning to that term that you may have heard before.

"On the issue of self-defense, there is a Connecticut statute, 53a-19 (a), entitled 'use of physical force in defense of person,' [a pertinent] part that provides as follows: 'A person is justified in using reasonable physical force upon another person to defend himself from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose, except that deadly physical force may not be used unless the actor reasonably believes that such other person is using or about to use deadly physical force or inflicting or about to inflict great bodily harm.'

"In this case, we're talking about the use of deadly physical force by the defendant. It is therefore the last portion of that section of the statute on self-defense that is implicated in this case, and I'm going to read it again to you.

"Deadly physical force may not be used unless the actor, meaning the defendant, reasonably believes that the other person, meaning the victim in this case, is using or about to use deadly force or inflicting or about to inflict great bodily harm on him. Deadly physical force means physical force that can reasonably be expected to cause death or serious physical injury.

"Serious physical injury means injury that creates a substantial risk of death or that causes serious disfigurement, serious impairment of health or serious loss or impairment of a function of any bodily organ. The term, great, has its ordinary meaning and connotes a bodily harm that is substantially more than minor or inconsequential harm.

"The term, using, has its ordinary meaning; that is, that the other person has already commenced the use of force. The words, about to use, have their ordinary meaning and connote an act ready to take place or about to occur, and not an act that is to take place at some unspecified future time.

"As I have stated earlier, the defendant does not have to prove that he acted in self-defense, but if self-defense is raised in the case as it has been in this case, then it is the state's burden to disprove that defense beyond a reasonable doubt.

"The statute focuses on the person claiming self-defense and focuses on what he reasonably believed under the circumstances, and presents a question of fact for the jury. In other words, what is important is what the

defendant reasonably believed under the circumstances of this case. You must also consider, however, whether the defendant, in fact—whether what the defendant, in fact, believed was objectively reasonable under the circumstances. Thus, you must first determine whether the defendant believed that an attack was imminent, and then you must determine whether that belief was reasonable.

"Similarly, you must determine whether the degree of force used was reasonable. The test for the degree of force in self-defense is a subjective, objective test, meaning it has some subjective aspects and some objective aspects. Self-defense, therefore, requires the jury to measure the justifiability of the defendant's actions from a subjective perspective; that is, what the defendant reasonably believed under the circumstances present in the case and on the basis of what the defendant perceived the circumstances to be.

"Section 53a-19 (a) requires, however, that the defendant's belief must have been reasonable and not irrational or unreasonable under the circumstances; that is, would a reasonable person in the defendant's circumstance have reached that belief. That is the objecti[ve] part of the test. It is both a question of what his belief was and whether it was reasonable.

"In this case, if you find proven beyond a reasonable doubt that the victim was not using or about to use deadly physical force or inflict great bodily harm upon the defendant, and if you further find beyond a reasonable doubt that the defendant had no reasonable belief that the victim was going, was using, or was about to use deadly physical force or about to inflict great bodily harm upon the defendant, then the defendant would not be justified in using deadly physical force upon the victim. You would, under those circumstances, reject the defense of self-defense. Remember, however, that the burden remains on the state to [dis]prove the defense of self-defense beyond a reasonable doubt.

"The law recognizes an exception to the justification of the use of deadly physical force as self-defense. In that same section, 53a-19, it provides [in pertinent] part as follows: 'Notwithstanding the provisions of subsection (a), which provides for the use of reasonable force, a person is not justified in using deadly physical force upon another person if he knows he can avoid the necessity of using such force with complete safety by retreating.' The statute requires both that retreat be completely safe and available, and that the defendant knew of it. Complete safety means without any injury whatsoever to him.

"Now, as I've told you, the self-defense statute focuses on the person claiming self-defense. It focuses on what he reasonably believes under the circumstances, and presents a question of fact as to whether a safe retreat was available and whether the defendant subjectively knew of it. Retreat is only required where the defendant himself knows that he can avoid the necessity of using physical force with complete safety.

"If you find proven beyond a reasonable doubt that a safe retreat was available and that the defendant knew of it, you should reject the self-

several times in reference to Barnes in his requested instruction. The defendant did not request an instruction to clarify his use of the term "victim" in his requested charge.

The defendant argues that by referring to Barnes as the "victim," the court communicated to the jury that it believed that a crime had been committed against Barnes. The defendant correctly points out that the court speaks to the jury from a "vantage point of authority and influence." He posits that such a communication would have "trespassed upon the jury's function" to determine whether he acted in self-defense or committed a crime against Barnes. The defendant argues that if the court used the term as a means of merely distinguishing between actors, it did not convey this to the jury. According to the defendant, the court's use of the term had the effect of assisting the state in disproving the claim of self-defense, thereby infringing on his rights to present a defense and to receive a fair trial. The defendant did not object to the court's instruction on this ground[9] and seeks review of his claim under *State*

defense claim. The law stresses that self-defense cannot be retaliatory. It must be defensive and not punitive, so you must ask yourself, did the defendant know that he could avoid the use of deadly physical force by retreating safely. If so, and yet he chose to use—to pursue the use of deadly physical force, you should reject the self-defense claim.

"In summary, you have heard all the evidence in this case with reference to the defendant's claim of self-defense. The state must disprove this defense beyond a reasonable doubt. If not, you must find the defendant not guilty. Therefore, ladies and gentlemen, if you find the state has proven beyond a reasonable doubt each of the elements of the crime of murder and has disproved self-defense beyond a reasonable doubt, then you would find the defendant guilty of murder on that first count.

"If on the other hand you find that the state has failed to prove any one of the elements of the crime of murder or has failed to disprove self-defense beyond a reasonable doubt, then you would find the defendant not guilty of murder on the first count. And that is the charge as far as murder is concerned . . . ."

[9] After the jury returned its verdict, the defendant filed a motion for a judgment of acquittal and a motion for a new trial, both of which the court denied. In his motion for a judgment of acquittal, the defendant challenged

v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine, codified in Practice Book § 60-5.

The jury charge is used to convey to the jury the legal principles that apply to the matters before it. Certainly, clarity in jury instructions is a necessity that serves the ends of justice. Yet, as is often the case in unrelated contexts, certain words used in jury instructions can be capable of different interpretations. The appellate courts of this state have had occasion to consider the ambiguous nature of the term "victim." In *State* v. *Cortes*, 84 Conn. App. 70, 86, 851 A.2d 1230 (2004), aff'd, 276 Conn. 241, 885 A.2d 153 (2005), this court held that the trial court's pervasive use of the term in its jury charge deprived the defendant of a fair trial. The defendant in *Cortes*, convicted of crimes against his former girlfriend, disputed that any crime at all had been committed against the complainant. Id., 75–76. At trial, the defendant objected to the use of the term victim, to no avail. Id., 84. This court reasoned: "In cases in which the fact that a crime has been committed against the complaining witness is not contested, but only the identity of the perpetrator is in dispute, a court's use of the term 'victim' is not inappropriate. In cases in which the fact that a crime has been committed is contested, and where the court's use of the term 'victim' has been the subject of an objection and has not been the subject of a subsequent curative instruction, a court's use of

the court's self-defense instruction, as well as its use of the term victim, but did so on grounds other than those at issue in this appeal. Specifically, the defendant argued that the self-defense instruction was not adapted sufficiently to the facts presented in that it directed the jury to consider whether the victim, meaning Barnes, used or threatened to use deadly physical force. The defendant argued that given the evidence, the jury should have been directed to consider whether any of Barnes' associates at the scene had used or threatened to use deadly physical force, as the defendant testified. That issue is not before us. Having reviewed the defendant's post-verdict motions, as well as the oral argument related thereto before the trial court, we conclude that the defendant did not raise the claim presented in this appeal before the trial court.

the term may constitute reversible error. The danger in the latter type of case is that the court, having used the term without specifically instructing the jury as to its intention in using the term, might convey to the jury, to whatever slight degree, its belief that a crime has been committed against the complainant." Id., 86. As our Supreme Court opined in *Cortes*, the jury could have drawn only one inference from the trial court's repeated use of the term, where the very commission of a crime was at issue, namely, that the defendant had committed a crime against the complainant. *State* v. *Cortes*, 276 Conn. 241, 249 n.4, 885 A.2d 153 (2005). A similar claim was raised in *State* v. *Robinson*, 81 Conn. App. 26, 29–33, 838 A.2d 243, cert. denied, 268 Conn. 921, 846 A.2d 882 (2004), but this court held that the defendant waived his claim when he did not accept the trial court's offer to deliver a curative instruction to the jury. See also *State* v. *Warholic*, 278 Conn. 354, 370, 897 A.2d 569 (2006) (holding that prosecutor's use of term victim not improper); *State* v. *Smith*, 51 Conn. App. 589, 592, 724 A.2d 527 (1999) (same).

Relying on the rationale of *Cortes*, the defendant argues that the court's use of the term victim in reference to Barnes might have caused the jury to infer that the court believed, to whatever extent, that a crime had been committed against Barnes. At first glance, the defendant's claim seems persuasive, for if his conduct in shooting Barnes was justified, Barnes was not a victim of any crime at the defendant's hands on March 12, 1993. As the state points out, however, this case stands on different footing than does *Cortes*, in which the defendant objected to the court's use of the term victim in its charge. In the present case, the defendant not only failed to object to the court's use of the term victim, he specifically requested the court to use the term in its charge generally and in the self-defense instruction in particular.

We agree with the state that the doctrine of induced error applies here and precludes the defendant from

prevailing on his claim. "[T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional and induced constitutional error." (Citation omitted; internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 59 n.32, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). The doctrine has been applied in circumstances such as the present ones, in which a party claims that a trial court committed reversible error by delivering jury instructions that it asked the court to deliver. See, e.g., *State* v. *Cruz*, 269 Conn. 97, 105, 848 A.2d 445 (2004); *State* v. *Schiavo*, 93 Conn. App. 290, 300, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006); *State* v. *Zollo*, 36 Conn. App. 718, 736, 654 A.2d 359, cert. denied, 234 Conn. 906, 660 A.2d 859 (1995); *State* v. *Murdick*, 23 Conn. App. 692, 702, 583 A.2d 1318, cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991). The defendant requested that the court instruct the jury by referring to Barnes as the victim and cannot now be heard to challenge the fact that the court instructed the jury in a manner consistent with his request.[10]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[10] Because the defendant induced any error here, we do not afford *Golding* review to the claim. See *State* v. *Campbell*, 99 Conn. App. 86, 91, 912 A.2d 530 (2007) ("*Golding* review will not be afforded in cases of induced error"). To the extent that the claim is amenable to review under the plain error doctrine, we are not persuaded that an error exists that is so obvious that it affects the fairness and integrity of and the public confidence in the judicial proceedings or that the court's use of the term victim caused the defendant to suffer manifest injustice. Mindful of the confusion that the court's use of the term victim might have caused, it is significant in our plain error review that the defendant requested that the court use the termi-

nology at issue. We also recognize that both parties referred to Barnes as the victim during the trial and that the court, as is customary, instructed the jury that it was not to infer from its instructions that the court favored one party over another, that the defendant was to be presumed innocent and that the jury had the exclusive duty to find the facts at issue.